IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

YOGI KRUPA, Inc.,                             :
                                              :
                    Plaintiff,                :
                                              :
                                              :
                                              :
          v.                                  :
                                              :   Civil Action No. 22-226-CFC
GLeS, Inc., PRIMO PROPERTIES, LLC,            :
GPM INVESTMENTS, LLC                          :
                                              :
                                              :
                    Defendants.               :
                                              :
                                              :

---

Scott Thomas Earle, Randall Shaw MacTough, ZARWIN BAUM DeVITO
KAPLAN SCHAER TODDY P.C., Wilmington, Delaware; Stuart A. Schwager,
LERCH, EARLY & BREWER, Chtd., Bethesda, Maryland

*Counsel for Plaintiff*

William Edward Gamgort, Daniel Paul Johnson, Jennifer Marie Kinkus, YOUNG,
CONWAY, STARGATT & TAYLOR, Wilmington, Delaware

*Counsel for GLeS, Inc. and Primo Properties LLC*

Ronald P. Golden, III, BAYARD, P.A., Wilmington, Delaware; Karen T. Staib,
Michael A. King, SHIPMAN & GOODWIN LLP, Hartford, Connecticut

*Counsel for GPM Investments, Inc.*

## MEMORANDUM OPINION

November 9, 2022
Wilmington, Delaware

_____

COLM F. CONNOLLY,
CHIEF JUDGE

On February 22, 2022, Plaintiff Yogi Krupa, Inc. (Yogi Krupa) filed the

Complaint (D.I. 1) against Defendants GLeS, Inc. (GLeS), Primo Properties, LLC

(Primo), and GPM Investments, Inc. (GPM).  Yogi Krupa sought a temporary

restraining order (TRO), a preliminary and a permanent injunction, declaratory

relief, and damages under the Petroleum Marketing Practices Act, 15 U.S.C. §

2801 et seq. (the PMPA).  D.I. 1 at 12.  I granted a TRO as to only GPM on

February 25, 2022, D.I. 12, and I subsequently denied a preliminary injunction as

to all Defendants during a March 16, 2022, hearing.  D.I. 25 ¶ 3.  The TRO expired

on March 31, 2022.  D.I. 25 at 2.  Before me now is Defendants GLeS's and

Primo's Motion to Dismiss the Complaint.  D.I. 21.  I will grant the Motion

because the PMPA only authorizes civil actions against a franchisor, and neither

GLeS nor Primo are Yogi Krupa's franchisor.

## I.    BACKGROUND[1]

In 2005, GLeS entered a franchise agreement (the First Agreement) with

Tri-State Oil whereby GLeS leased a "BP" branded motor fuel station in Dover,

_____

[1] When assessing the merits of a Rule 12(b)(6) motion to dismiss, I accept as true
all factual allegations in the Complaint and view those facts in the light most
favorable to the plaintiff. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327,
351 (3d Cir. 2020); *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

Delaware (the Station) to and sold motor fuel (for resale to the public) to Tri-State Oil. D.I. 5-3 §§ 1, 2, 5(c); D.I. 1 ¶ 4. In 2006, Yogi Krupa's predecessor-in-interest, Yogi Corporation (Yogi Corp.), purchased from Tri-State Oil the right to take its place in the First Agreement. D.I. 1 ¶ 4, 10; 5-2 § 2; D.I. 28 at 9. GLeS thereinafter leased the Station to and sold motor fuel to Yogi Corp. D.I. 1 ¶ 7; D.I. 5-4 § 37. Under the PMPA, the right to lease a motor fuel station, use a trademark, and acquire motor fuel for resale is a "franchise," Yogi Corp. was the "franchisee," and GLeS was the "franchisor." D.I. 1 ¶ 7; 15 U.S.C. § 2801(1), (3), (4).

On February 23, 2007, GPM acquired the right to lease the Station and 27 similar properties from Primo and GLeS—the owners of the underlying premises—for 15 years pursuant to a Master Lease Agreement, D.I. 5-6 (the Master Lease). D.I. 1 ¶¶ 13–14. GPM also inherited the First Agreement from GLeS. D.I. 5-4 § 37; D.I. 1 ¶ 8. The Master Lease was set to terminate on February 28, 2022, but it gave GPM the right to renew for "[u]p to three (3) successive additional periods of five (5) years each . . . upon . . . one (1) year prior written notice prior to the expiration of the initial fifteen (15) year Term . . . ." D.I. 1 ¶¶ 14–15; D.I. 5-6 at 4. It also gave GPM a "right of first refusal (the 'ROFR') to purchase the Premises" and gave GPM the right to "freely assign . . . any or all of its rights, title and interest in and to" the Master Lease "without

2

Landlord's prior written consent or approval . . . ."  D.I. 5-6 §§ 18(n), 20(a)(3); D.I.
1 ¶¶ 18–19.

In June 2011, GPM and Yogi Krupa (now substituted for Yogi Corp.) opted
to replace the First Agreement.  D.I. 5-4 § 37; D.I. 17-4 § 20.  GPM agreed to lease
the Station to and distribute motor fuel to Yogi Krupa under a new Sublease
Agreement, D.I. 5-4, and a new Supply Agreement, D.I. 17-4.  D.I. 1 ¶¶ 10–12.
The Sublease Agreement was set to end on May 31, 2021, or with the termination
of the Master Lease, and it was "subject and subordinate to, in all respects, [] the
terms and conditions of Master Lease."  D.I. 5-4 §§ 2(a), 22(a); D.I. 1 ¶ 20.

The parties functioned under the Master Lease and the Sublease Agreement
without incident until March 2021, when GPM failed to exercise its option to
renew the Master Lease.  D.I. 1 ¶ 23.  In a letter dated March 22, 2021, GPM
offered to extend Yogi Krupa's lease through December 31, 2021, and added that,

> [d]uring the Extension Period [May 31 through December
> 31], GPM shall pursue an extension of GPM's master
> lease of the Premises.  If GPM is successful in extending
> GPM's master lease at the Premises, GPM and [Yogi
> Krupa] may negotiate a further extension of the Sublease
> and Supply Agreement[s] on mutually agreeable terms.
> However, in the event GPM is unsuccessful in extending
> the term of the master lease, this letter will serve as 90-
> days' notice to [Yogi Krupa] of GPM's intent not to renew
> the [the Sublease Agreement and the Supply] Agreement,
> which shall then expire on December 31, 2021.

D.I. 5-7; D.I. 1 ¶ 22.  Yogi Krupa apparently agreed to the extension.

3

In a letter dated August 31, 2021, GPM informed Yogi Krupa that,

> [p]ursuant to the terms of the Sublease and Supply Agreement[s], the term[s] of the Sublease and [Supply] Agreement[s] shall expire on December 31, 2021.
>
> The Master Lease between [GLeS] and [Primo] . . . and GPM relating to the [Station] is terminating and will not renew.   Accordingly, pursuant to Section 2 of the Sublease, the Sublease shall terminate on December 31, 2021 and not renew.  The Supply Agreement shall also terminate on December 31, 2021.
>
> Should Sublessee [i.e., Yogi Krupa] desire to continue leasing the Premises, Sublessee may contact [GLeS and Primo] directly to discuss the possibility of a direct lease between [GLeS and Primo] and Sublessee.  Sublessee may contact Mark Greco of [Primo] at [phone] or [email].
>
> To the extent any franchise relationship exists between Sublessee and GPM, a copy of the summary statement described in section 104(d) {15 U.S.C. § 2804(d)} of the PMPA is attached hereto as **Exhibit A**. . . .

D.I. 5-8 (bold and curly brackets in original); D.I. 1 ¶ 24.  By agreement dated December 6, 2021, GPM extended the Sublease Agreement to February 28, 2022, the last day of GPM's Master Lease with Primo/GLeS.  D.I. 5-11; D.I. 1 ¶ 35.

Yogi Krupa met in person with Primo's Mark Greco on September 21, 2021, and Greco told Yogi Krupa that Primo and GLeS would entertain an offer to purchase the Station outright.  In October 2021, Yogi Krupa offered to purchase the Station for $2.1 million.  D.I. 1 ¶¶ 28–29; D.I. 5-9 at 2.  On November 10, 2021, Greco emailed Himanshu Patel of Yogi Krupa that a third party—later

identified as Carroll Independent Fuel, LLC (Carroll)—had made a "substantially higher" offer to purchase the Station. D.I. 5-9 at 5–6; D.I. 1 ¶ 30. Greco added that, "[i]f we proceed with the sale, they [i.e., Carroll] have told us that they will meet with you to discuss an offer for you to stay in the location" and that "[Carroll] recognize[s] that you and the other dealers [i.e., franchisees] have been operating the business for several years and they are willing to meet with each of you in hopes of reaching agreements to continue your operations." D.I. 5-9 at 5–6; D.I. 1 ¶ 30. Yogi Krupa increased its offer to $2.5 million on November 10, 2021. D.I. 5-9 at 7; D.I. 1 ¶ 29. But, in an email to Patel on November 22, 2021, Greco declined Yogi Krupa's offer. D.I. 5-10 at 2–3; D.I. 1 ¶ 31. Instead, Greco wrote that Carroll would visit the six motor fuel stations it was about to purchase and asked Patel to "[p]lease make sure everything is in good working order and your staff is standing tall and offering excellent customer service so they make a good impression"; Greco added that "I discussed with them that you live in New Jersey and operate in Delaware and they are interested in speaking with you about the possible operation of other locations where they may have opportunities for long time operators like yourself." D.I. 5-10 at 2–3; D.I. 1 ¶¶ 31, 34. Yogi Krupa met with Carroll in December 2021; but, on February 1, 2022, "Jay Tan of Carroll informed Yogi Krupa for the first time that Carroll was not going to provide Yogi

5

Krupa with a new lease and Carroll was going to company operate the [S]tation."

D.I. 1 ¶¶ 34, 36.  This action ensued.

> Yogi Krupa's Complaint alleges that Primo and GLeS

>> violated, directly or indirectly, the PMPA when they
>> failed to provide Yogi Krupa with an opportunity to
>> renew its franchise relationship at to [sic] the Station []
>> due to their entering into an Agreement of Sale with
>> Carroll to sell the Station [] knowing that Yogi Krupa
>> had not been offered an assignment of the ROFR that
>> GPM had under the Master Lease.

D.I. 1 ¶ 43.  Yogi Krupa brought further allegations against GPM.  D.I. 1 ¶ 42.

On the same day that Yogi Krupa filed its Complaint, D.I. 1, Yogi Krupa filed a Motion for Temporary Restraining Order and Preliminary Injunction, D.I. 4, that sought to prohibit Defendants from "taking any action to terminate or nonrenew [Yogi Krupa's] franchise" and sought to keep the Sublease Agreement and the Supply Agreement in place, D.I. 5-16 at 3.  On February 25, 2022, I held a three-hour teleconference hearing with the parties, D.I. 32, and I granted a TRO only as to GPM, D.I. 12.  On March 16, 2022, I held a four-and-a-half hour hearing with the parties.  D.I. 31.  At the conclusion of that hearing, I denied Yogi Krupa's Motion for a Preliminary Injunction; I extended the TRO until March 22, 2022; and I asked the parties to provide a joint proposed order that would permit Yogi Krupa to vacate the Station on a reasonable timeline.  D.I. 31 at 120, 127–28.

Pursuant to my March 23, 2022, Order, the TRO expired on March 31, 2022. D.I. 25 at 2.

In connection with the TRO and preliminary injunction hearings and motions, both Yogi Krupa and Defendants provided other documentation and factual allegations. *See, e.g.*, D.I. 5-1; D.I. 16. I consider those facts and documents here only if the Complaint references the document in question.

## II.   LEGAL STANDARD

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but the complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

7

When considering a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and view them in the light most favorable to plaintiffs. *Umland*, 542 F.3d at 64. I may consider matters of public record and documents attached to, "integral to[,] or explicitly relied upon in" the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up); *see also Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (same).

## III.   DISCUSSION

The PMPA prohibits a franchisor from refusing to renew a franchisee's lease of a motor fuel station, save on specified grounds. 15 U.S.C. § 2802. A franchisee may enforce that prohibition via a civil action in federal court against its franchisor. 15 U.S.C. § 2805(a). At issue here is whether the PMPA provides a cause of action against a franchisor's landlord. Consistent with binding precedent, I find that it does not and will, therefore, dismiss Yogi Krupa's claims against GLeS and Primo.

Yogi Krupa's Complaint alleges that GLeS and Primo violated the PMPA when GLeS and Primo sold the Station to Carroll and did not permit Yogi Krupa to renew its franchise. D.I. 1 ¶ 43. GLeS and Primo argue that I should dismiss the allegations against them because the PMPA does not apply to the relationship between GLeS/Primo and Yogi Krupa and that, even if it did, the claims fall outside the PMPA's statute of limitations. D.I. 22 at 2–3. Yogi Krupa responds

that its claims arise not from the First Agreement alone, but from both the GLeS-Yogi Krupa franchise relationship that began in 2006, D.I. 28 at 2, 8, and Yogi Krupa's status as an "intended third-party beneficiary" of the Master Lease, D.I. 28 at 9.

### A.    The PMPA's Structure

Parties are generally free to establish the bases for nonrenewal or termination of their contracts.  But the PMPA limits termination or nonrenewal of a motor fuel franchise to specified grounds and permits franchisees to bring causes of action against franchisors for failure to renew the franchise relationship.  15 U.S.C. §§ 2802, 2805.  But "the application of the PMPA is limited to causes of action arising between franchisees and franchisors engaged in the petroleum marketing field." *Patel v. Sun Co.* ("*Patel V*"), 63 F.3d 248, 251 (3d Cir. 1995).

The PMPA's definitions set the statute's scope.  A franchise governs the relationship between a franchisee and franchisor.  15 U.S.C. § 2801(1), (2).  "[A] 'franchise' is defined as 'any contract' that [1] authorizes a franchisee to use the franchisor's trademark, as well as any associated agreement [2] providing for the supply of motor fuel or [3] authorizing the franchisee to occupy a service station owned by the franchisor." *Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC*, 559 U.S. 175, 178–79 (2010) (quoting 15 U.S.C. § 2801(1)(A)) (footnote omitted).  A franchisee is "a retailer or distributor . . . who is authorized or permitted, under a

9

franchise, to use a trademark in connection with the . . . distribution of motor fuel." 15 U.S.C. § 2801(4). Similarly, a franchisor is "a refiner or distributor . . . who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the . . . distribution of motor fuel." 15 U.S.C. § 2801(3). A distributor "purchases motor fuel for . . . distribution to another" and includes the distributor's affiliates. 15 U.S.C. § 2801(6). And a retailer "purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7). Refiners, which refine crude oil, are not relevant here. 15 U.S.C. § 2801(5).

The PMPA permits a franchisee to "maintain a civil action" against a franchisor under three sections, but two sections—§ 2803 (related to trial franchises) and § 2807 (related to renewable fuel pumps)—are not relevant here. 15 U.S.C. § 2805(a). Section 2802 prohibits a franchisor from "fail[ing] to renew any franchise relationship" unless "such nonrenewal is based upon a ground described in [§ 2802 of the PMPA]." 15 U.S.C. §§ 2802(a) and (b)(1)(B). A franchisee must bring an action within one year of the date that either the franchise is terminated or the franchisor fails to comply with § 2802. 15 U.S.C. § 2805(a).

## B.    The PMPA's Applicability to GLeS and Primo

Yogi Krupa argues that the PMPA applies to GLeS and Primo on two grounds: First, GLeS and Yogi Krupa had a franchise relationship that began in 2006 and persisted until 2022, and Primo is an affiliate of GLeS. D.I. 29 at 8.

10

Second, Yogi Krupa is an "intended third-party beneficiary of the Master Lease." D.I. 29 at 9. But Yogi Krupa's Complaint does not support the first argument, and the second argument, even if true, would not expand the PMPA's reach to include Primo and GLeS. Instead, the PMPA only permits an action by a franchisee against a franchisor. 15 U.S.C. §§ 2802(a), 2805(a).

The Complaint does not support Yogi Krupa's argument that GLeS and Yogi Krupa had a franchise relationship from 2006 until 2022. A franchise is a contract whereby, in connection with the use of a trademark, a franchisor leases a motor fuel station to or supplies motor fuel to a franchisee. *Mac's Shell*, 559 U.S. at 178–79. And a "franchise relationship" only concerns obligations "under a franchise." 15 U.S.C. § 2801(2). GLeS was the franchisor for Yogi Corp. in 2006, since GLeS both leased the Station to and sold motor fuel to Yogi Corp. in connection with the "BP" trademark. D.I. 1 ¶ 7. But, on June 1, 2011, GPM and Yogi Krupa signed a Supply Agreement that replaced the parties' prior agreement, made GPM Yogi Krupa's "exclusive supplier of [branded gasoline, diesel fuel, and kerosene][,]" and prohibited Yogi Krupa from selling fuel branded under any other trademark. D.I. 17-4 §§ 1(a), 4, 20; D.I. 1 ¶ 11. On the same date, GPM and Yogi Krupa signed a Sublease Agreement that "supersede[d] all prior agreements[,]" including the First Agreement. D.I. 5-4 § 37; D.I. 1 ¶ 11. As of June 1, 2011, at the latest, therefore, Yogi Krupa purchased its motor fuel from and leased a

11

trademark and the Station from GPM and from no other party.  Under the PMPA, Yogi Krupa could only have had a franchise relationship with GPM and not with GLeS.  Yogi Krupa's conclusory assertion otherwise, D.I. ¶ 40, is of no import, and, Primo's alleged relationship to GLeS is irrelevant, D.I. 28 at 3–4.  To the extent that Yogi Krupa alleges violations of the First Agreement, the PMPA's one-year statute of limitations has long since passed.  15 U.S.C. § 2805(a).

Further, whether or not Yogi Krupa is an intended third-party beneficiary of the Master Lease has no bearing on whether the PMPA reaches GLeS and Primo. "[T]he application of the PMPA is limited to causes of action arising between franchisees and franchisors engaged in the petroleum marketing field." *Patel V*, 63 F.3d at 251.  Yogi Krupa argues that the Master Lease places certain restrictions on GPM's entry into new subleases, preserves the right of Primo and GLeS to take over each sublease if the Master Lease terminates, and prohibits GPM from taking an action that would violate the PMPA.  D.I. 29 at 9.  But the PMPA does not speak of third-party beneficiaries or offer protections for subtenants against master landlords.  While the PMPA may have offered protections against GLeS or Primo if GLeS or Primo ever exercised the right to take over the Sublease Agreement, Yogi Krupa nowhere alleges that either GLeS or Primo ever did so.  In short, the PMPA does not reach a subtenant's indirect relationship with its master landlord—

12

i.e., it does not reach a franchisee's indirect relationship with its franchisor's landlord.

The Third Circuit has confirmed this understanding of the PMPA. In *Patel V*, the Patels entered a franchise agreement directly with Sun Company, a motor fuel refiner and marketer, in 1978. 63 F.3d at 249. In 1987, Sun sold the motor fuel station premises to Lancaster Associates, and Lancaster leased the motor fuel station back to Sun through September 30, 1994; Sun then subleased the motor fuel station back to plaintiffs through August 20, 1994. *Id.* at 249–50. In April 1994, Sun notified plaintiffs of nonrenewal due to the expiration of Sun's lease with Lancaster, and plaintiffs brought suit against both Sun and Lancaster. *Id.* at 250. The Third Circuit held that "Lancaster is not a refiner or distributor of motor fuel, and therefore falls outside the literal scope of the statute. For this reason, the Patels cannot obtain relief against Lancaster under the PMPA." *Id.* at 251. Primo and GLeS are landlords to Yogi Krupa's franchisor, and, just as in *Patel V*, Yogi Krupa cannot obtain relief against Primo and GLeS under the PMPA.

Yogi Krupa cites *Koylum, Inc. v. Peksen Realty Corp.*, 272 F.3d 138 (2d Cir. 2001), for the proposition that a court may grant preliminary relief under the PMPA even when the facts are unclear. D.I. 28 at 9–10. In *Koylum*, franchisee Koylum purchased motor fuel from Ocean and rented a motor fuel station from Pesken; the Pesken and Ocean corporations had common owners. *Id.* at 140–41.

13

Koylum alleged both that Pesken and Ocean threatened termination of its lease and fuel supply agreement on improper grounds and that Pesken sold the station to 1677 Ridge, a third corporation, without providing Koylum with its PMPA-mandated right of first refusal; it sought a preliminary injunction against Pesken and 1677 Ridge. *Id.* at 141–42. The Second Circuit held that Pesken had a franchise relationship with Koylum, allowed Koylum to seek relief on that basis, and never considered whether Koylum also needed a franchise relationship with 1677 Ridge to seek relief under the PMPA. *Id.* at 145–46. For that reason, only the Second Circuit's analysis of Koylum's franchise relationship with Pesken is persuasive. And that relationship is distinguishable, because, at the time of Yogi Krupa's nonrenewal, GLeS and Primo lacked a franchise relationship with Yogi Krupa. Even at a preliminary stage, Yogi Krupa must allege sufficient facts to support a plausible inference that a franchise relationship existed before it could bring a claim under a PMPA. *See Id.* at 146 ("What matters is whether the complaint alleges a violation of the Act. This turns, in part, on whether a franchise relationship existed at the time of the events complained of.").

Yogi Krupa urges me to "keep in mind that the PMPA was intended to remedy the disparity of bargaining power between franchisors and franchisees" and that its "'overriding purpose'" was "'to protect the franchisee's reasonable expectation of continuing the franchise relationship.'" D.I. 28 at 6–7 (quoting *Ellis*

14

*v. Mobil Oil*, 969 F.2d 784, 788 (9th Cir. 1992)); *see also Patel V*, 63 F.3d at 250 (similar). But Congress balanced franchisee rights with the "flexibility" distributors needed "to respond to changing market conditions . . . ." *Patel V*, 63 F.3d at 250 (cleaned up). Congress granted courts limited authority under the PMPA; I cannot expand that authority beyond what the statute allows. Finally, two sentences of Yogi Krupa's briefing assert that its Complaint "alleges sufficient facts to put squarely in question whether GLeS and Primo's relationship with GPM was less than arm's length." D.I. 28 at 12. But Yogi Krupa fails to point to any factual allegations that support this argument; such "a passing reference to an issue will not suffice to bring that issue before this court." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004) (cleaned up).

## IV.   CONCLUSION

For the above reasons, I will grant Primo's and GLeS's Motion to Dismiss.

Primo and GLes have asked that I award them the attorney fees they have expended in defending this action. I will, however, exercise my discretion and deny that request, as I do not think Primo and GLes have established that Yogi Krupa's claims are frivolous. *See* 15 U.S.C. § 2805(d)(3) ("[T]he court may, in its discretion, direct that reasonable attorney . . . fees be paid by the franchisee if the court finds that [an] action [under § 2805] is frivolous.").

The Court will issue an Order consistent with this Memorandum Opinion.

15